**UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

TAIMI MEGIVERN,

       Plaintiff,

v.                                     Case No. 11-10026

GLACIER HILLS INC.,

       Defendant.

_____/

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFF'S MOTION TO COMPEL**

In this wrongful termination action, Plaintiff Taimi Megivern alleges that her

employer, Glacier Hills Inc., unlawfully discriminated against her because of her

pregnancy and interfered with benefits due her under the Family Medical Leave Act

("FMLA") and the Employee Retirement Income Security Act ("ERISA").  Before the

court is Defendant's motion for summary judgment and Plaintiff's renewed motion to

compel.  Both motions have been fully briefed, and the court heard oral argument on

February 10, 2012.  For the following reasons, the court will grant Defendant's motion

for summary judgment and deny Plaintiff's motion to compel.

## I.  BACKGROUND

Defendant is a non-profit, continuing care senior living community located in Ann

Arbor, Michigan.  (*See* Glacier Hills Senior Living Community, http://www.glacierhills.org

(last visited Oct. 2, 2011), Dkt. # 23-20.)  In August 2007, Defendant hired Plaintiff as a

Recreational Therapy Programmer ("RTP").  (Megivern Dep. 9:25-10:24, July 7, 2011,

Dkt. # 23-3, 33-2.)  In that position, Plaintiff's primary job duties included planning and

supervising activities for Glacier Hills residents, completing resident assessments and other paperwork, and attending care conferences. (*Id.* at 44:1-11.)

### A. Plaintiff's Job Performance Under Supervisor Marcia Kirk (February 2008-June 2009)

Plaintiff received her first performance evaluation during her employment with Defendant on February 21, 2008. In that evaluation, Plaintiff's supervisor, Marcia Kirk, rated Plaintiff as "meet[ing] minimum standards" in virtually all categories, though Plaintiff received a rating of "consistently exceeds standards" and a rating of "far exceeds standards" in two categories related to her interaction with residents. In addition, Ms. Kirk generally commented that Plaintiff is "very giving to the residents," Plaintiff is "[v]ery conscientious re: serving the residents," and Plaintiff's "[d]ocumentation with assessments and placing information in the computer calendar program is excellent." (2/21/08 Perf. Eval., Dkt. # 23-9.)

In May or June of 2009, Kirk completed another performance evaluation of Plaintiff, this time noting mixed results. Plaintiff was again rated as "meets minimum standards" in the vast majority of categories, but she received the lower grade of "partially meets minimum standards" regarding her interactions with co-workers. To that end, Kirk commented as follows: "[Plaintiff] is influenced by others and allows peer pressure to create negative attitudes towrds [sic] co-workers. When [Plaintiff]'s attitude becomes negative it impacts her relationships with her co-workers and supervisors." Kirk also listed as a goal for the coming year that Plaintiff "[r]emove personal feelings & attitudes towards co-workers when working as a team player." On the other hand, Plaintiff's 2009 evaluation also contained positive feedback. Kirk rated Plaintiff as

2

"consistently exceed[ing] standards" in the category of computer skills, noting Plaintiff was "[v]ery knowledgeable & helpful w/others." Kirk's general comments included further praise: "[Plaintiff] is an asset to the Recreational Therapy Department. She has excellent skills for planning, implementing and evaluating intergenerational activities with the residents. She is creative and provides good ideas and suggestions." (6/4/09 Perf. Eval., Dkt. # 23-10.)

Plaintiff disagreed with her 2009 evaluation, as she believed that she deserved higher-than-average marks in most categories. (Megivern Dep. 134:22-135:11; *see also* 6/4/09 Perf. Eval. (Plaintiff's comments: "I do not think that this evaluation accurately reflects my work. I go above and beyond every day. If one were to ask any of the residents with which I work, they would say how wonderful I am to them. I personally would give myself 5's and 4's for my constant dedication to and care for the residents here.").) Plaintiff also felt her poor rating in the area of her relationships with her coworkers was undeserved, and she opined that it was based on prior discussions in which Plaintiff had voiced her view that Kirk had an unprofessional attitude in her dealings with Glacier Hill employees and volunteers. (Megivern Dep. 132:13-134:21; *see also* 6/4/09 Perf. Eval. (Plaintiff's comments: "most coworkers love me!"; "[i]t is sometimes difficult [to support the Glacier Hills mission statement] in a non-harmonious atmosphere!"; "staff in recreation department must *all* work on [removing personal feelings and attitudes when dealing with coworkers]. Discord is difficult, even for the best of us!").)

Plaintiff voiced her dissatisfaction with her evaluation in a meeting with Kirk that Plaintiff describes as an "argument" or "discussion" that "was like a little storm."

3

(Megivern Dep. 135:22-136:3.)  Plaintiff also approached other staff members "kind of" hoping to prove Kirk wrong about the low score regarding Plaintiff's interactions with coworkers, and those individuals with whom Plaintiff spoke reportedly "laughed" at the suggestion that they might have problems with Plaintiff as a co-worker.  (*Id.* at 137:16-138:13.)  Furthermore, Plaintiff wrote her own self-evaluation that she sent, unsolicited, to the Glacier Hills' CEO Ray Rabidoux and Glacier Hills' Director of Advancement Gerie Greenspan, as part of a request that she receive a change in her job title to reflect her training as a social worker.  (*Id.* at 136:15-137:15, 138:14-21.)  In the self-evaluation, Plaintiff highlights her contributions to the recreation department, refutes Kirk's lackluster evaluation of her performance, and notes that recent changes to her job duties leave her "wonder[ing] how [she] will possibly accomplish everything [she is] to do."  (6/18/09 Email, Dkt. # 23-11.)

## B.  The Hiring of Stacy Kudlak and Reorganization of the Recreation Department (August 2009)

In August 2009, Glacier Hills's Executive Director of the Care and Rehabilitation Center, Kim Thompson, removed Kirk as supervisor of the Recreation Department, and Stacy Kudlak was hired in her place.  (Thompson Dep. 18:2-3, Sept. 7, 2011, Dkt. # 23-5, 33-8.)  Thompson testified that she found the Recreation Department's performance lacking when compared with programming in place at similar institutions, (*id.* at 41:14-24), and Kudlak confirmed that, when she was first hired, Thompson made known that she considered the RTPs "inadequate" and she expected Kudlak would most likely have to "get rid of the whole department" and hire a new staff, (Kudlak Dep. 40:20-41:4, 43:12-22, Aug. 3, 2011, Dkt. # 23-2, 33-9).

4

Consequently, Thompson and Kudlak began reorganizing the responsibilities of the RTPs, which at that point became known as Life Enrichment Coordinators ("LECs"). (Megivern Dep. 55:9-56:10.)  Whereas the RTPs had previously planned activities and shared the paperwork for all Glacier Hills residents, Kudlak assigned each LEC to one wing of the facility; that LEC was then responsible for conducting daily activities and completing all paperwork for the residents housed in his or her designated unit.  (*Id.* at 61:13-20.)  Specifically, a LEC had to complete a state-mandated assessment of each resident's interest and hobbies within two to three days after admission to the LEC's unit.  (*Id.* at 46:18-47:15, 48:3-11, 58:20-59:19, 64:2-22.)  The LEC would then use the assessment to complete a care plan for the resident, which had to be updated annually. (Kudlak Dep. 14:6-24.)  LECs were also expected to run two group activities for their residents per day, (Megivern Dep. 63:5-15), and to record on a calendar each activity in which a resident participated, observed, or declined, (Megivern Aff. ¶ 14, Dkt. # 33-10; *see also* Attendance Logs, Dkt. # 23-22).

### C. Early Signs of Friction Between Plaintiff and Kudlak (October 2009-February 2010)

Pursuant to Kudlak's reorganization of the Recreation Department, Kudlak assigned Plaintiff to the unit Two South, a subacute hall that could house up to forty-five residents.  (Megivern Dep. 59:20-60:18, Dkt. # 23-3.)  Almost immediately, Plaintiff found it difficult to keep up with all the paperwork required by her new position.  (*Id.* at 59:20-60:3, 60:24-61:24.)  For example, Plaintiff had more beds in her unit than any other LEC, (*id.* at 60:6-23), and since she worked on the subacute level where there was inherently more admissions, on average she had more resident assessments to

5

complete than the other LECs, (Thompson Dep. 61:7-62:20). Because each resident assessment could take between half an hour to more than an hour to complete, (Kudlak Dep. 126:20-22; Megivern Dep. 75:4-20), and an assessment could only be conducted when a resident was not otherwise busy with a doctor's appointment, a family visit, or another obligation, Plaintiff often struggled to finish all of her assessments within the requisite two or three days after a resident's admission, (Megivern Aff. ¶ 12). Plaintiff also failed to comply with the calendar system for recording residents' participation in planned activities, choosing to use her own system of keeping attendance because "the paperwork demands of [her] position were impossible for [her] to keep up with." (*Id.* at ¶¶ 15-16.)

In Plaintiff's view, she was not alone in her struggles to keep up with her workload after Kudlak reorganized the department. She claimed all LECs felt they "didn't have enough time in the day to do all the necessary tasks," (Megivern Dep. 17:2-5), a view echoed by Malgorzata Wielbut, the art therapist in the Life Enrichment Department from September 2005 until April 2010, (Wielbut Aff. ¶¶ 12-22, Dkt. # 33-11). Wielbut further asserted that, when employees would try to broach the issue of needing more time to complete their work at staff meetings, Kudlak was not receptive. (*Id.* ¶¶ 19-20.) In general, Plaintiff did not agree with Kudlak's approach to running the Life Enrichment Department, (Megivern Dep. 94:7-95:7), she considered herself more qualified to manage the department than Kudlak, (*id.* at 75:21-78:25), and early on she began keeping a "log" of Kudlak's practices and other conduct she found objectionable, (*id.* at 83:12-84:15). For her part, Kudlak testified that, for all of Plaintiff's claims that she was overworked, Plaintiff was "lazy," "took lots of smoke breaks," was often seen

6

"reading the paper" or "chatting," and sometimes would be found "interacting with people" in areas of the facility outside of the designated unit "where she was supposed to be working." (Kudlak Dep. 125:13-126:1, 127:5-11.)

Plaintiff was not shy about voicing her belief that her workload was unmanageable. For example, on October 23, 2009, Kudlak sent Plaintiff an email asking that Plaintiff make sure she is entering resident activity information in the computer, as Kudlak had noticed Plaintiff had failed to do this for one resident. In response, Plaintiff apologized, explaining "it is very easy for things to slip by because there are so many different things to juggle for Two South." Plaintiff further stated that "[d]espite writing to the point of my hand hurting, I feel that I am never caught up!" and asked what could be done "to help even out the workload so that I am not feeling overloaded." (*Id.*) Plaintiff requested whether, in addition to filling a full-time LEC position that was then open, they could hire a second new LEC, noting that "[o]ne of the reasons I had been getting some overtime was because I was just trying to accomplish my tasks within the time given" and "I am only one human and sometimes it feels like I would need 10 or 11 hours in a day in order to feel like I'm 'on top of things.'" (*Id.*) Kudlak wrote back offering Plaintiff five hours of overtime per week until a new LEC was hired, expressing her opinion that "we will all be overwhelmed until we get another 40 hour team member" and urging Plaintiff "to prioritize" and "keep the lines of communication open and do [her] best." (10/23/09 Emails, Dkt. # 23-13.)

Plaintiff and Kudlak also seem to have had some run-ins regarding attendance at Plaintiff's planned activities on Two South in late 2009. When Kudlak had first assigned the LECs to specific units, Plaintiff had asked to be placed on the first floor with the

long-term residents, a request she renewed when the first-floor LEC was fired in October 2009. (Megivern Dep. 95:17-96:7.) Kudlak declined to reassign Plaintiff to the first floor, initially telling Plaintiff she was unhappy with her performance on Two South. (*Id.* at 96:7-9.) Plaintiff interpreted Kudlak's remark as dissatisfaction with low attendance at her activities, which Plaintiff attributed to the fact that residents admitted to the subacute ward usually stayed at Glacier Hills only for a short time and were therefore less interested in activities. (*Id.* at 96:9-18, 97:8-14.) In mid-October 2009, Kudlak began requiring the LECs to send daily emails reporting the number of participants in their activities. (*Id.* at 97:15-19.) Plaintiff abided by this request for a time, but she eventually came to believe that Kudlak was no longer requiring the other LECs to send the attendance updates. (*Id.* at 97:20-99:1.) Plaintiff raised her concern about the unfairness of being singled out for this task in an email to Kudlak and, when Kudlak didn't respond, stopped sending the updates. (*Id.* at 99:2-100:24.) Finally, in an email sent on November 27, 2009, Kudlak gave Plaintiff specific instructions regarding activities she directed Plaintiff to plan during the month of December "to up [Plaintiff's] participation level." (11/11/09 Email, Dkt. # 23-17.)

After a routine audit of the LECs' paperwork in conjunction with a team meeting on February 11, 2010, Kudlak instructed Plaintiff to conduct a new assessment and care plan for a long-term resident whose most recent paperwork had been completed in 2006. (Kudlak Dep. 80:13-19; 4/13/10 Email, Dkt. # 23-7.) It was common for Kudlak to discover incomplete care plans from during these audits, and it was also routine for her to direct the responsible LEC to correct specific deficiencies in their paperwork during team meetings. (Kudlak Dep. 80:20-81:4.)

8

In late February 2010, Plaintiff unsuccessfully applied for the position of Resident Centered Care Program Manager.  As part of the application, Kudlak was required to assess Plaintiff's job performance and attendance.  She commented as follows: "[Plaintiff]'s job performance is average.  During her work day she presents as sullen and unenthusiastic.  Her attendance is good.  I hear positive responses from residents about her interactions with them."  (Transfer Request Form, Dkt. # 23-14.)

### D.  Plaintiff Complains About Pay and Holidays and Announces Her Pregnancy (Early April 2010)

On April 3, 2010, Plaintiff sent Kudlak an email expressing her dissatisfaction with Kudlak's method of determining which LECs would work which holidays, as she had been assigned four holidays in 2010 while other LECs had only one or two.  In the same message, Plaintiff also requested Kudlak's "assur[ance] . . . that everyone in [the] department is paid equitably and fairly," as she had heard that an LEC with less seniority had been paid a higher hourly wage than her.  (4/3/10 Email, Dkt. # 23-15.)

Plaintiff learned she was pregnant on April 2, 2010, and announced the news to a group of her coworkers on April 5, 2010.  (Megivern Dep. 68:18-25, 167:17-168:6.) There is some dispute as to when Kudlak learned of Plaintiff's pregnancy; Kudlak maintains that she found out about it from another LEC when it was a "newer event" but cannot recall the exact date, (Kudlak Dep. 64:17-65:23), while Plaintiff testified that Kudlak was present when she first broke the news to her coworkers on April 5, 2010, (Megivern Dep. 167:17-168:11).  Once Kudlak did hear of Plaintiff's pregnancy, she recalls approaching Plaintiff, "let[ting] her know that I heard she was pregnant and [giving] her a big hug and was all excited for her."  (Kudlak Dep. 66:2-7.)

9

Eventually, Kudlak also discussed Plaintiff's pregnancy with Thompson, but again it is unclear the date on which Thompson first learned of Plaintiff's condition.  (*Id.* at 66:8-11.)  Thompson never discussed Plaintiff's pregnancy with Plaintiff, as she habitually does not "congratulate . . . or send . . . card[s]" to her pregnant employees. (Thompson Dep. 36:2-6.)  Later on, Plaintiff discovered she was pregnant with twins and communicated this update to Kudlak, who in turn told Thompson.  (4/27/10 Email, Dkt. # 23-25; Thompson Dep. 46:14-25.)

### E.  Kudlak Audits Plaintiff's Charts and Finds Several Missing Documents (April 7-15, 2010)

Plaintiff went on a scheduled vacation from April 7 to April 15, 2010.  (Megivern Dep. 68:2-7.)  Kudlak alleges that, in the course of covering Plaintiff's paperwork responsibilities, she discovered some red flags that led her to audit some of Plaintiff's charts.  (Kudlak Dep. 76:12-77:3.)  On April 13, 2010, Kudlak sent Plaintiff an email listing a number of gaps in Plaintiff's documentation uncovered by the audit, including: no assessment or care plan for four recently admitted residents, including a resident admitted on March 29, 2010; failure to complete a new assessment or care plan for a long-term resident as Kudlak had instructed at the meeting on February 11, 2010; no quarterly progress note on another long-term resident; and the seeming lack of a reliable system for keeping track of Plaintiff's obligation to complete quarterly progress notes in a timely fashion.  (4/13/10 Email, Dkt. # 23-7.)

On April 15, 2010, Kudlak sent Plaintiff another email, this one in response to the message Plaintiff had sent on April 3, 2010, about pay and holidays.  Kudlak suggested

10

that they "get together" the next morning to discuss Plaintiff's concerns.  (4/15/10 Kudlak Email, Dkt. # 23-18.)

Plaintiff replied to both of Kudlak's emails late in the afternoon on April 15, 2010, her first day back to work after her vacation.  After noting that she was "trying to catch up on lots of paperwork," Plaintiff declined Kudlak's request for a meeting, stating "I would really prefer an email response for anything like this . . . I don't feel like I have ANY spare time to discuss those things, when email is a bit faster and more efficient."[1] Plaintiff then addressed each of the concerns Kudlak raised in her April 13, 2010 email, indicating that she had since completed some tasks and her failure to complete others was due to circumstances outside of her control, such as the health of a resident.  With respect to the paperwork she had been instructed to complete at the February 11, 2010 meeting, she conceded that "I made a mistake by not doing it exactly how you wanted" because she was unfamiliar with the paperwork obligations for long-term residents.  She explained more generally that "*mistakes are bound to happen*" and when "*everything* takes priority (especially after just getting back and having a lot to catch up on)," some things will "fall[] in [sic] the cracks" and "naturally take the back burner until I can find the time."  (4/15/10 Megivern Email, Dkt. # 23-18.)

_____

[1]Plaintiff reiterated this request in another email, sent to Kudlak the next day, seemingly in response to a note Kudlak left for Plaintiff.  Plaintiff explained her preference for email communication as follows: "I don't have much time while I'm trying to do catch up after my vacation and for certain things, I prefer to 'discuss' on email, so that there is no misunderstanding later about what was communicated." (4/16/10 Email, Dkt. # 23-19.)

11

### F. Plaintiff Receives a Written Warning and Performance Improvement Plan (April 19-20, 2010)

On April 19, 2010, after consulting with Thompson and Kim Cybart, a representative of Defendant's Human Resources Department, Kudlak met with Plaintiff, issued her a written "Employee Warning Notice," and placed Plaintiff on a "Performance Improvement Plan" ("PIP").  (Kudlak Dep. 89:24-91:7.)  The warning, given for "Inadequate Job Performance," noted that: Kudlak's audit of Plaintiff's charts showed a "70% paperwork completion percentage"; Plaintiff's paperwork was "out of compliance with State guidelines"; and, although Plaintiff told Kudlak in her email on April 15, 2010, that she had attempted to complete some tasks but had simply failed to do them "exactly how [Kudlak] wanted," the relevant files evinced no such attempt.  (Employee Warning Notice, Apr. 19, 2010, Dkt. # 23-20.)

The PIP instructed Plaintiff to complete all assessments and care plans within forty-eight hours of a resident's admittance and to keep up with her annual updates to long-term residents' assessments and care plans.  To help with these goals, the PIP suggested that Plaintiff work on her time management skills—including "watch[ing] number of breaks . . . [and] time spent talking with colleagues"—prioritize her paperwork, implement a "tickler" system to remind her to perform annual updates, and follow through with requests made by her supervisor.  The PIP was to run for one month—from April 19, 2010, through May 19, 2010—during which Plaintiff would have weekly meetings with Kudlak to discuss her progress.  (Performance Improvement Plan, April 19, 2010, Dkt. # 23-20.)

After Kudlak gave Plaintiff the warning and PIP, the remainder of their meeting seems devoted to discussing Plaintiff's numerous complaints about her position and Kudlak's management of the department.  Besides the wage and holiday concerns brought up in Plaintiff's email of April 3, 2010, Plaintiff indicated that she was losing a lot of time to supervising volunteers, she was "running" all the time at work and had a blister on her toe, and she has "fewer hours than ever" to do her job.  She reiterated her request that she be transferred to the first floor as well as her preference for communicating over email, again stating she does not have time for meetings and she likes to have things written down for future reference.  Plaintiff also told Kudlak she was upset about not being hired for Kudlak's position, as she was "more qualified" than Kudlak because she "already knew all the residents."  Plaintiff warned Kudlak that she had been keeping "extensive notes" and she might have to share them with Kudlak's superiors.  (4/19/10 Meeting Notes, Dkt. # 23-8, at 1-2.)

Also on April 19, 2010, Plaintiff composed an extensive "Employee's Statement" responding to Kudlak's warning notice, which she sent to Human Resources.  (Megivern Dep. 82:8-11.)  In the statement, Plaintiff detailed anew her responses to Kudlak's charged mistakes, even asserting that she had found in a resident's chart an initial assessment and care plan that Kudlak had "falsely report[ed]" as missing.  She further noted that she had "repeatedly [told Kudlak] that the workload is *too much* and that things inherently will fall in [sic] the cracks because of that" and Kudlak's recent cut to her hours had "made the issue of mistakes coming up *even more common*."  Plaintiff expressed her view that the warning "seems to have come up as a 'retaliation' against me for daring to speak my mind to [Kudlak]," as she had recently voiced to Kudlak

13

concerns over wages, the holiday work schedule, and the hiring of a new LEC for the

first-floor position.  In this vein, Plaintiff stated that: many other LECs make the same

mistakes for which she received the warning; Kudlak had only chose to audit her charts

because Kudlak was "*looking* for a reason to get [her] in trouble"; "[a] simple verbal

warning would have sufficed in this situation, but it seems that every little mistake is

needed in order to make me look like a bad employee"; and "I am, in fact, an excellent

employee by virtually everybody's standards, even [Kudlak's], up until the point where I

made my concerns known to her."  Plaintiff concluded her statement with the following

thoughts:

> [Kudlak's] goal is clearly to fire me, and she is looking for every available
> opportunity to do so, and it's frankly unfair.  Not just unfair to me, but unfair
> to the residents who adore me and my fellow staff who respect the work I do.
> The Human Resources Department should expect to see more about me
> from [Kudlak], I am sure, as she spends valuable company time micro-
> managing me and seeking out any and every opportunity to make me look
> like a substandard employee.

(4/19/10 Email, Dkt. # 23-16.)

Plaintiff also sent Thompson a lengthy email "complaint" about Kudlak, again

expressing her belief that her warning was "retaliatory" and "punishment" for bringing up

concerns about the management of the department.  The email extensively details

examples from Plaintiff's "diligent notes about [Kudlak]," which Plaintiff offers to support

her beliefs that Kudlak has a "[l]ack of concern for residents, family, staff and

volunteers," has depleted the department's budget with wasteful practices, is

unprofessional, does not keep an accurate schedule for the department, has treated her

unfairly, and is incompetent.  Plaintiff expressed a "request that any response you give

14

be strictly via email" because Plaintiff's "time at work is for service to the residents" and
email "leaves no room for miscommunication."  (4/20/10 Email, Dkt. # 23-23.)

### G. Plaintiff's Performance Under the PIP and Request for Leave Information (April 26, 2010-May 13, 2010)

Plaintiff and Kudlak had their first meeting to assess Plaintiff's progress under the
PIP on April 26, 2010.  When Kudlak brought up that Plaintiff still had not properly
completed a long-term resident's progress note as Kudlak had asked at the February
11, 2010 meeting, Plaintiff admitted that she "really didn't have time to review the PIP."
(4/26/10 Meeting Notes, Dkt. # 23-8, at 3.)  Plaintiff now alleges that her repeated failure
to complete this task was "due to a miscommunication" regarding her paperwork
obligations for long-term residents, and she properly completed all of the required
paperwork once the misunderstanding "was cleared up."  (Megivern Aff. ¶¶ 21-22.)
Kudlak also had found "holes" in two care plans Plaintiff had completed and instructed
Plaintiff to correct them.  Plaintiff responded that "things fall through the cracks."
(4/26/10 Meeting Notes.)

Plaintiff and Kudlak's next meeting occurred on May 3, 2010.  Kudlak noted that
Plaintiff was behind in three initial assessments and had failed to complete an annual
assessment that had been due on March 4, 2010.  Plaintiff again said she did not have
enough time to keep up with her paperwork.  Kudlak also discussed some new job
responsibilities that Plaintiff would have to take on in the wake of another LEC's
departure.  Plaintiff said she would "do her best" but "time is a factor," even though
Kudlak reminder her that, as of May 1, her responsibility for facilitating activities had
decreased to one activity per day.  Also on May 3, 2010, a resident on Plaintiff's unit

15

had complained to Thompson that he did not have the current May calendar of activities posted in his room.  Kudlak checked the other rooms on Plaintiff's floor and found that most had an old calendar or no calendar.  When questioned about this, Plaintiff responded that volunteers had been tasked with posting the new calendars, but Kudlak noted that Plaintiff should have noticed the old calendars and taken steps to make sure each resident had a current calendar.  (5/3/10 Meeting Notes, Dkt. # 23-8, at 4.) Plaintiff alleges that May 3, 2010, had been her first work day in the month of May, so she had not yet had the opportunity to ensure her residents had up-to-date calendars. (Megivern Aff. ¶ 23.)

At the May 11, 2010 meeting, Kudlak discovered that Plaintiff was now eleven assessments behind.  Kudlak asked Plaintiff if she had been able to complete a lot of assessments the previous night because, due to an appointment, Plaintiff had not arrived at work until 2:00 p.m. and should have stayed until 10:00 p.m. to make up her hours.  Plaintiff replied that she had left at 5:00 p.m. because she was hungry, and she would make up the hours at a later date.  Additionally, Kudlak pointed out to Plaintiff that she still was not properly completing the required paperwork for her long-term residents, noting again that she had to complete a new care plan annually rather than merely signing off on an old plan, as she had done in the case of one resident.  Kudlak and Plaintiff also discussed a potential schedule that would allow the second-floor LECs to devote every Monday or Tuesday to assessments, in order to account for the high number of admissions most weekends. (5/11/10 Meeting Notes, Dkt. # 23-8, at 5.)   At the close of this meeting, Kudlak believed Plaintiff had not successfully completed the requirements laid out in the PIP, but had not yet decided whether to recommended that

Plaintiff should be fired as a result because the PIP ran for another week.  (Kudlak Dep. 127:12-21.)

During her May 11, 2010 meeting with Kudlak, Plaintiff asked about FMLA and disability benefits, and Kudlak referred her to Human Resources.  On May 13, 2010, Plaintiff met with Trisha Schauer, a Human Resources representative, to discuss her options for taking short-term disability and FMLA leave in connection with her pregnancy.  As Plaintiff recalls, she told Schauer that she would "eventually" need to take leave "because [she] was pregnant with twins" and she wanted to investigate her options.  (Megivern Dep. 110:15-17.)  From Schauer's perspective, the meeting was "strictly . . . informational," and she provided Plaintiff only with "general information" about potential leave for an indeterminate period "five, six, seven months down the road."  (Schauer Dep. 17:8-20, 43:21-44:1, Sept. 9, 2011, Dkt. # 23-4.)  Thus, although Plaintiff claims that it "was known that [she] would be interested in utilizing [her] benefits at some point in the future," she did not specifically request to use FMLA or short-term disability leave for her maternity leave nor did she identify a designated date on which she would like to start her leave.  (Megivern Dep. 110:21-111:10.)

### H.  Plaintiff's Suspension for Insubordination and Subsequent Termination (May 14, 2010-May 26, 2010)

On the morning of May 14, 2010, Thompson approached Plaintiff and told her they "needed" to meet and asked if they could get together sometime that day.  (*Id.* at 111:18-24.)  Thompson remembers that she wanted to speak with Plaintiff about her April 20, 2010 email complaint about Kudlak, as well as how things were going with the PIP.  (Thompson Dep. 51:6-17, 53:18-54:22.)  Plaintiff initially told Thompson that they

17

could meet after lunch, but later emailed Thompson to say she was too busy to meet and, in any case, she preferred to communicate over email, outside of work hours. (Megivern Dep. 111:24-112:8; Thompson Dep. 52:2-8; 5/14/10 Email, Dkt. # 23-21.) Thompson did not consider this an appropriate response to her request for a meeting, and, when she went to find Plaintiff, she was told that Plaintiff was on a smoke break. (Thompson Dep. 52:8-13.)  When Thompson returned to the unit a short time later, Plaintiff had clocked out for lunch, even though she had an activity scheduled for that time.  (*Id.* at 52:13-20.)[2]  Thompson considered Plaintiff's refusal to meet face-to-face as insubordination, and she suspended Plaintiff for a week with pay pending an investigation.  (*Id.* at 52:21-53:12; *see also* Megivern Dep. 112:6-14.)

After Plaintiff's suspension, Kudlak, at Thompson's direction, began investigating Plaintiff's progress under the PIP.  Kudlak discovered several performance issues since Plaintiff had been placed on the PIP, most notably a widespread failure to complete assessments on time.  Of the thirteen assessments Plaintiff had conducted since the start of the PIP, eleven had not been finished within three days of the resident's admission.  As of Plaintiff's suspension on May 14, 2010, another five assessments that had not been completed were late.  Furthermore, Kudlak found that Plaintiff had not been keeping proper attendance logs and she had neglected to conduct several one-on-one visits with a resident as proscribed in the resident's care plan.  Kudlak also

---

[2]Plaintiff refutes that she was on a smoke break when Thompson came to look for her, as she had stopped smoking at work once she found out about her pregnancy. (Megivern Aff. ¶ 19.)  She also alleges that, prior to taking her lunch break, she had informed Kudlak that she was postponing her scheduled activity by half an hour, and she did in fact hold the activity when she returned from lunch.  (*Id.* ¶ 25.)

noted Plaintiff's "insubordination issues" with herself and Thompson, specifically "refusing to meet and insisting that all communication be done in writing," as problems. (Notes, Dkt. # 23-8, at 6-9.)

Plaintiff was terminated on May 26, 2010.  The "Termination Notice," signed by Thompson, gave the reason for Plaintiff's termination as follows: "Employee placed on performance improvement plan 4/19/2010.  Her performance did not improve to satisfactory status. . . . Employee resisted or failed each of the significant components of the plan."  (Termination Notice, Dkt. # 23-27.)  Thompson confirmed at her deposition that, though it was Plaintiff's "performance" rather than her "insubordination" on May 14, 2010, that motivated the decision to fire her, (Thompson Dep. 37:16-38), Thompson also considered Plaintiff's history of "adversarial" and "argumentative" behavior when she determined that termination was appropriate, (*id.* at 134:15-19, 139:10-13).  After Plaintiff was put on leave, she "gr[ew] to believe" that the disciplinary actions taken against her were "because of her pregnancy more than anything else," though at the time she "didn't think that."  (Megivern Dep. 172:22-173:23.)

## I. Plaintiff Files Suit for Pregnancy Discrimination and FMLA/ERISA Interference (January 2011-Present)

On January 3, 2011, Plaintiff initiated this action against Defendant, bringing claims for FMLA interference, ERISA interference, and discrimination on the basis of sex and/or pregnancy under Title VII, Michigan's Elliott-Larsen Civil Rights Act (the "ELCRA"), and Ann Arbor's City Code.  Defendant filed the instant motion for summary judgment on October 7, 2011.

19

On October 11, 2011, Plaintiff filed a motion to compel Defendant to produce "any performance evaluations, discipline, warnings, performance improvement plans, exit interviews, or termination notices for any person who requested leave or became pregnant during the time Kim Thompson was Director."  During a telephone conference with the court, Defendant agreed to produce some limited responsive discovery, and the court terminated the motion to compel as moot.  On January 9, 2012, Plaintiff renewed her motion to compel, arguing the materials produced in relation to the first motion to compel warranted Defendant's compliance with the entirety of Plaintiff's request to produce.

## II.  STANDARD

### A.  Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  When deciding a motion for summary judgment, the court "is not to 'weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Sagan v. United States*, 342 F.3d 493, 497 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).  "The central issue is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'"  *Id.* at 497 (quoting *Anderson*, 477 U.S. at 251-52).  "The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the [movant] is entitled to a verdict . . . ."  *Anderson*, 477 U.S. at 252.

20

The party seeking summary judgment has the initial burden of showing the absence of a genuine dispute as to a material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. It is not enough for the nonmovant to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Rather, the nonmovant must sufficiently allege a fact that, if proven, "would have [the] effect of establishing or refuting one of essential elements of a cause of action or defense asserted by the parties." *Midwest Media Prop. L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 469 (6th Cir. 2007) (alteration in original) (quoting *Kendall v. Hoover Co.*, 751 F.2d 171, 174 (6th Cir. 1984)) (internal quotation marks omitted).

Both parties must support their assertions "that a fact cannot be or is genuinely disputed" by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A). Alternatively, either party may carry its burden by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(B). "The court must view the evidence in the light most favorable to the non-moving party, drawing all reasonable inferences in that party's favor." *Sagan*, 342 F.3d at 497 (citing *Matsushita*, 475 U.S. at 587). "Hearsay evidence, as well as evidence which is irrelevant to the issue presented, must be disregarded." *U.S. Structures, Inc. v. J.P. Structures, Inc.*, 130 F.3d 1185, 1189 (6th

21

Cir. 1997) (citing *Dole v. Elliott Travel & Tours, Inc.*, 942 F.2d 962, 968-69 (6th Cir. 1991)).

### B.  Motion to Compel

Federal Rule of Civil Procedure 26(b)(1) allows discovery

regarding any nonprivileged matter that is relevant to any party's claim or defense . . . .  For good cause, the court may order discovery of any matter relevant to the subject matter involved in the action.  Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence.

Fed. R. Civ. P. 26(b)(1).  The broad reach of Rule 26(b)(1) is tempered by Rule 26(b)(2)(C), which mandates the court to limit discovery if the discovery sought "is unreasonably cumulative or duplicative," can be obtained from another, more economical source, if the discovery seeker already had a chance to obtain the information, or if the cost-benefit analysis disfavors production when properly placed in the context of the case.

"Relevant" in the context of the rules of discovery is necessarily broader than "relevant" as that term is used in the rules of evidence.  *See EEOC v. Konica Minolta Bus. Solutions U.S.A., Inc.*, 639 F.3d 366, 369 (7th Cir. 2011); *NLRB v. New Eng. Newspapers, Inc.*, 856 F.2d 409, 414 n.4 (1st Cir. 1988).  But any analysis of what types of information are reasonably likely to lead to the discovery of admissible evidence begins with a determination of what would be admissible; the admissibility inquiry, in turn, begins with evidentiary relevance.  Relevant evidence means "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401.

22

## III. DISCUSSION

Plaintiff brings two types of claims related to her termination: first, that Defendant discriminated against her on the basis of sex and pregnancy; and second, that Defendant unlawfully interfered with her right to take medical leave under the FMLA and ERISA.  With respect to her discrimination claim, Plaintiff argues that she can establish both a single-motive claim—that illegal discrimination motivated her termination—and a mixed-motive claim—that both legitimate reasons and illegal discrimination motivated her termination.  *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 396 (6th Cir. 2008).[3] While Plaintiff can likely establish a prima facie case of discrimination or interference on all of her claims, she cannot show that Defendant's legitimate reason for her termination was either pretextual or would not have result in her termination but for her pregnancy. Accordingly, the court will grant Defendant's motion for summary judgment. Furthermore, because the discovery requested by Plaintiff in her renewed motion to compel is, at best, only minimally relevant to her claims yet is likely to impose great burden and expense on Defendant, the court will deny that motion.[4]

---

[3]Plaintiff has provided no case law to support the analysis of her pregnancy discrimination claim under *both* a single-motive and a mixed-motive theory.  As the Sixth Circuit has noted, "[a]llegations of discriminatory conduct . . . fall into *one* of two categories: single-motive claims . . . or mixed-motive claims." *Spees v. James Marine, Inc.*, 617 F.3d 380, 389-90 (6th Cir. 2010) (emphasis added).  Nevertheless, as Plaintiff's complaint could plausibly be read to support either a single-motive or mixed-motive claim, and the parties address both theories in their briefs, the court will determine whether Plaintiff can survive summary judgment on either a single-motive or a mixed-motive claim.

[4]In light of the court's decision to grant summary judgment to Defendant, Plaintiff's renewed motion to compel is arguably moot.  Nevertheless, because Plaintiff seeks discovery of information that could potentially bolster her case on summary judgment, the court will rule on the merits of the motion.

### A.  Pregnancy Discrimination: Single-Motive Claim

Plaintiff first claims that Defendant unlawfully discriminated against her under Title VII, the ELCRA, and the Ann Arbor City Code by terminating her because of her pregnancy.  Title VII makes it an "unlawful employment practice for an employer . . . to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex."  42 U.S.C. § 2000e-2(a).  "Because of sex" as used in Title VII includes "because of or on the basis of pregnancy, childbirth, or related medical conditions."  42 U.S.C. § 2000e(k). "[W]omen affected by pregnancy, childbirth, or related medical conditions shall be treated the same for all employment-related purposes . . . as other persons not so affected but similar in their ability or inability to work."  *Id.*

Similarly, the ELCRA prohibits an employer from "discharg[ing] or otherwise discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status."  Mich. Comp. Laws § 37.2202.  Again, the term "'sex' includes, but is not limited to, pregnancy, childbirth, or a medical condition related to pregnancy or childbirth."  *Id.* § 37.2201(d).  The Michigan Supreme Court has indicated that employment-discrimination claims under the ELCRA should be analyzed in the same manner as an analogous Title VII claim.  *See Hazle v. Ford Motor Co.*, 628 N.W.2d 515, 520-21 (Mich. 2001).

The Code of the City of Ann Arbor provides that "[n]o person shall discriminate in the employment, compensation, work classifications, conditions or terms, promotion or demotion, or termination of employment of any person."  Ann Arbor, Mich., Code ch.

24

112, § 9:151. "Discriminate" is defined, in relevant part, as "mak[ing] a decision . . .

based in whole or in part on the actual or perceived . . . sex . . . [or] condition of

pregnancy . . . of another person . . . ." *Id.* § 9:154. Furthermore, the Code provides a

private cause of action for an individual who is the victim of prohibited discrimination.

*Id.* § 9:164. The parties did not provide, nor could the court locate, any cases applying

or interpreting these provisions. Rather, the parties presume that Plaintiff's claim under

the Ann Arbor City Code should be analyzed in the same manner as her Title VII and

ELCRA claims, and the court finds no reason to disagree with this assumption.

Plaintiff presents only circumstantial evidence in support of her single-motive

claim that Defendant fired her because of her pregnancy, and the court therefore

applies the familiar, burden-shifting framework articulated by the Supreme Court in

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973), as modified by *Texas

Department of Community Affairs v. Burdine*, 450 U.S. 248, 252-54 (1981). *White*, 533

F.3d at 391. To survive summary judgment:

> First, the plaintiff has the burden of proving by the preponderance of the
> evidence a prima facie case of discrimination. Second, if the plaintiff
> succeeds in proving the prima facie case, the burden shifts to the defendant
> "to articulate some legitimate, nondiscriminatory reason for the employee's
> rejection." Third, should the defendant carry this burden, the plaintiff must
> then have an opportunity to prove by a preponderance of the evidence that
> the legitimate reasons offered by the defendant were not its true reasons, but
> were a pretext for discrimination.

*Burdine*, 450 U.S. at 252-53 (citations omitted). "The ultimate burden of persuading the

trier of fact that the defendant intentionally discriminated against the plaintiff remains at

all times with the plaintiff." *Id.* at 253.

25

### 1. *Prima Facie Case*

To state a prima facie case for pregnancy discrimination, Plaintiff "must show (1) she was pregnant, (2) she was qualified for her job, (3) she was subjected to an adverse employment decision, and (4) there is a nexus between her pregnancy and the adverse employment decision." *Asmo v. Keane, Inc.*, 471 F.3d 588, 592 (6th Cir. 2006) (citing *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 658 (6th Cir. 2000)). Defendant does not contest that Plaintiff has met the first three factors of her prima facie case, arguing only that she has failed to demonstrate a nexus between her pregnancy and her termination.  Contrary to Defendant's assertions, Plaintiff can establish a prima facie case of pregnancy discrimination.

Plaintiff's announcement of her pregnancy was sufficiently close in time to her termination to satisfy the nexus requirement.  In *Asmo*, the Sixth Circuit held that a plaintiff alleging pregnancy discrimination could meet this element of her prima facie case solely through temporal-proximity evidence, when the plaintiff had been terminated within two months of her supervisor learning of her pregnancy.  *Id.* at 592.  This case involves a virtually identical fact situation.  Plaintiff informed her coworkers that she was pregnant in early April 2010, and she was terminated by the end of May 2010.[5]

---

[5]Plaintiff also claims that the timing of her suspension and termination is suspicious because it happened within days of Plaintiff's May 11, 2010 inquiry to Kudlak and her May 13, 2010 meeting with Schauer about her options for maternity leave; additionally, on May 12, 2010, Thompson received an email from a Human Resources representative advising that they "may need to suggest" Plaintiff start taking intermittent FMLA leave if she continues complaining that she is too tired to work a full-time schedule, (5/12/10 Email, Dkt. # 33-29).  As Plaintiff avers that Defendant discriminated against pregnant women because of their anticipated need for time off from work, this may also provide some evidence of a temporal link between Plaintiff's termination and her pregnancy.

26

Additionally, the undisputed evidence shows that, ever since Kudlak reorganized the recreation department in the fall of 2009, Plaintiff had difficulty keeping up with her paperwork and had communicated this issue with Kudlak. (*See, e.g.*, 10/23/09 Email, Dkt. # 23-13.)  However, it was not until mid-April 2010—mere days after Plaintiff first disclosed her pregnancy to her co-workers—that Kudlak decided to audit Plaintiff's charts and determine the extent of this problem.[6]  In the context of unlawful retaliation claims, the Sixth Circuit has held that this type of post-protected-activity event—"increased scrutiny [combined] with the temporal proximity of . . . termination"—can provide *prima facie* evidence of a causal connection between an employee's protected activity and an adverse employment action.  *See Hamilton v. Gen. Electric Co.*, 556 F.3d 428, 435-36 (6th Cir. 2009) ("The fact that the scrutiny *increased* is critical.").  Such evidence seems equally probative in the employment-discrimination context.  Plaintiff has shown a nexus between her pregnancy and her termination and has therefore carried her burden of establishing a prima facie case of pregnancy discrimination.

### 2.  Pretext

Plaintiff does not dispute that Defendant has presented a legitimate, nondiscriminatory reason for her termination: namely, her performance issues.  Instead, Plaintiff offers a number of arguments as to why Defendant's proffered explanation is

---

[6]Kudlak claims that the audit was motivated by the paperwork discrepancies she discovered while filling in for Plaintiff during her vacation, rather than Plaintiff's newly announced pregnancy.  (Kudlak Dep. 120:5-12.)  The veracity of this explanation is a question of fact that cannot be resolved on summary judgment, when the court must view the evidence in the light most favorable to Plaintiff.

pretextual.  "A plaintiff can refute the legitimate, nondiscriminatory reason articulated by an employer to justify an adverse employment action 'by showing that the proffered reason (1) had no basis in fact, (2) did not actually motivate the defendant's challenged conduct, or (3) was insufficient to warrant the challenged conduct.'"  *Johnson v. Kroger Co.*, 319 F.3d 858, 866 (6th Cir. 2003) (quoting *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000)).  Plaintiff points to evidence relevant to the second and third inquiries, but she cannot carry her burden of showing that Defendant terminated her for pretextual reasons.

   *a.  Defendant's Proffered Reason Is Not Insufficient to Warrant Plaintiff's Termination*

            Regarding Plaintiff's contention that her actions did not merit termination, she asserts that other LECs had been behind in their assessments but had not faced disciplinary action.  Deposition testimony from former LECs alleged that all LECs struggled with the timely completion of assessments and would sometimes finish their assessments late, (Byal Dep. 7:11-8:23, Oct. 6, 2011, Dkt. # 33-23; DeMercurio Dep. 23:13-24:4, Dkt. # 33-16), yet Kudlak would confront only some people about this issue, (DeMercurio Dep. 22:13-23:6).  Kudlak confirmed that "[c]ompleting assessments on time has been an issue with more than just [Plaintiff]."  (Kudlak Dep. 120:5-12.)  Moreover, it is uncontested that Plaintiff received more assessments than any other LEC due to her assignment to the largest sub-acute unit.

        These general observations, however, are not enough to create a genuine issue of material fact as to whether Plaintiff's conduct warranted termination.  Thompson, the relevant decisionmaker, testified at her deposition that she "didn't think" other LECs were as behind in their assessments as Plaintiff, (Thompson Dep. 142:18-143:2), and

28

while other LECs were "lazy," none had behaved as Plaintiff had, (*id.* 138:19-139:5).

Additionally, while both Thompson's and Kudlak's deposition testimony shows that

Plaintiff's failure to complete initial assessments on time was an important deficiency in

Plaintiff's performance, it was far from the only problem.  Kudlak's correspondence with

Plaintiff and her notes regarding the PIP demonstrate particular concern over Plaintiff's

repeated failure to learn and properly implement the procedures for updating the

paperwork of long term residents.  Thompson also cited Plaintiff's insubordinate,

argumentative attitude and behavior as well as her ability to "get[] activities done" as

factors in her decision.  (*Id.* at 134:12-19, 135:25-139:13, 142:2-7.)[7]  In light of all this

evidence of Plaintiff's performance problems beyond the late completion of

assessments, a few general statements from Kudlak and other LECs fail to demonstrate

that Defendant's proffered reason was insufficient to warrant Plaintiff's termination.

      *b.  Defendant's Proffered Reason Actually Motivated Plaintiff's Termination*

The remainder of Plaintiff's pretext arguments relate to whether Defendant's

articulated reason, rather than improper discrimination on the basis of her pregnancy, in

fact prompted her termination.  On that score, the temporal-proximity and increased-

scrutiny evidence discussed above weighs in Plaintiff's favor.  *See Asmo*, 471 F.3d at

598; *DeBoer v. Musashi Auto Parts, Inc.*, 124 F. App'x 387, 393-94 (6th Cir. 2005).

They are not, however, sufficient to demonstrate pretext.  For that, Plaintiff must provide

additional evidence showing that Defendant's proffered reason is simply not worthy of

credence.  *See Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th

---

[7]Plaintiff's assertion that her insubordination did not properly factor into the
termination decision will be addressed below.  *See infra* Section III.A.2.b.ii.

Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009). Plaintiff presents five additional reasons why Defendant's nondiscriminatory justification is pretextual, but all fall short of her burden

### i. Failure to Audit Charts of Other LECs

First, Plaintiff seizes on Kudlak's acknowledged failure to audit all the other LECs' charts, as opposed to just Plaintiff's, when she discovered problems with Plaintiff's paperwork. (*See* Kudlak Dep. 119:23-120:12.) Plaintiff argues that this demonstrates that Kudlak and Thompson were not actually concerned with the mistakes in and timeliness of Plaintiff's assessments, because otherwise they would have made sure all the LECs were complying with these requirements. This argument fails for the same reason that Plaintiff's anecdotal evidence of other LECs' untimely completion of assessments does not establish that Plaintiff's conduct was insufficient for termination. Plaintiff had performance problems other than late assessments, and beyond even her noncompliance with paperwork requirements.

### ii. Shifting Rationales for Plaintiff's Termination

Second, Plaintiff alleges that Defendant has offered shifting rationales for her termination, which calls into question the credibility of those justifications. *See Cicero v. Borg-Warner Auto, Inc.*, 280 F.3d 579, 592 (6th Cir. 2002). Here, Plaintiff points to two purportedly conflicting statements made by Kudlak and Thompson at their depositions. On one hand, Thompson, when asked by Plaintiff's counsel whether the May 14, 2010 incident motivated Plaintiff's termination, replied: "No, it was her performance. She was suspended for the insubordination." (Thompson Dep. 37:16-20.) On the other, Kudlak

30

allegedly[8] surmised that the reason Thompson fired Plaintiff was because of Plaintiff's insubordination on May 14, 2010.  (Pl.'s Br. Opp'n Summ. J. 13, Dkt. # 33.)

These statements do not demonstrate any change in Defendant's justification for terminating Plaintiff that would tend to show pretext.  Thompson signed Plaintiff's Termination Notice and confirmed at her deposition that she made the decision to fire Plaintiff, so Kudlak's conjecture about what motivated Thompson's actions is irrelevant.[9] Thompson's rationale for firing Plaintiff has been consistent.  The Termination Notice stated the reason for her termination as the failure to improve her performance under the PIP, noting that "[e]mployee resisted or failed each of the significant components of the plan."  (Termination Notice, Dkt. # 23-27.)  At her deposition, Thompson elaborated on this assessment, detailing all of the ways in which Plaintiff's performance fell short. (Thompson Dep. 37:16-38:1, 134:12-19, 135:25-139:13, 141:18-142:15.)  This testimony indicates that the incident on May 14, 2010, was unquestionably the basis for

---

[8]In her response brief, Plaintiff quotes what she purports to be Kudlak's statement to this effect at her deposition.  However, neither Plaintiff nor Defendant provides the cited page in their excerpts of Kudlak's deposition, so it is not possible to confirm that Kudlak testified as Plaintiff represents.  In fact, the only testimony in the record on this point is Kudlak's statement that "I don't know what [Thompson] was thinking" when asked about Thompson's rationale for firing Plaintiff.  (Kudlak Dep. 100:20-101:2.)  Nevertheless, the court will assume that Kudlak also made the statement cited in Plaintiff's response.

[9]At oral argument, Plaintiff contended that both Kudlak and Thompson were decisionmakers with respect to Plaintiff's termination.  This assertion is simply not supported by the record.  Kudlak participated in the decision to put Plaintiff on the PIP, (Kudlak Dep. 89:11-91:7; Thompson Dep. 34:13-14, 38:2-15), performed the investigation of Plaintiff's progress under the PIP, and reported those results to Thompson, (Kudlak Dep. 102:3-103:20; Thompson Dep. 50:5-15).  However, based on Thompson and Kudlak's deposition testimony, it was Thompson alone who ultimately determined that Plaintiff should be terminated.  (Kudlak Dep. 42:15-23, 100:25-101:5; Thompson Dep. 37:16-38:1, 76:19-24.)

31

Plaintiff's suspension and evinced a pattern of unacceptable, argumentative behavior that factored into the termination decision—but it, alone, did not motivate Thompson to terminate employment.[10]   Rather, it was the whole picture of Plaintiff's performance under the PIP, which itself was indicative of Plaintiff's conduct and attitude throughout her time at Glacier Hills.

### iii.   Thompson's Failure to Congratulate Plaintiff

Third, Plaintiff asserts that Thompson's failure to congratulate Plaintiff on her pregnancy is evidence of pretext.  This argument rests on the following passage from *Asmo*:

> The most significant evidence showing pretext is Santoro's conduct after Asmo announced she was pregnant with twins.  In October 2001, Asmo, Santoro and the entire SG & A team were participating in a conference call, during which Asmo informed the team that she was pregnant with twins.  The news was met with congratulations from all her colleagues except Santoro, who did not comment and then "simply moved on to the next business topic in the conference call."  Santoro's initial silence is suspect.  Pregnancies are usually met with congratulatory words, even in professional settings.  When

---

[10]Plaintiff attempted at oral argument to cast into doubt the validity of Plaintiff's suspension for insubordination.  Specifically, she averred that a reasonable jury could conclude that Plaintiff's behavior on May 14, 2010, was not insubordinate, as Plaintiff may have thought Thompson wished to discuss her email complaint about Kudlak rather than her performance problems.  However, it is unclear to the court how Thompson's reasons for wanting to speak with Plaintiff would make a difference when interpreting Plaintiff's reaction to Thompson's request.  Furthermore, even if the court determined that an issue of material fact existed with respect to this particular incident, it would not be dispositive.  Plaintiff's discrimination claim is premised on the adverse employment action of her termination, and there are several, uncontested incidents in the record supporting Thompson's assessment that Plaintiff had an adversarial attitude towards her supervisors.  These include: Plaintiff's multiple demands of Thompson and Kudlak that all communication be in writing; Plaintiff's response to the 2009 performance evaluation completed by Kirk; Plaintiff's meticulous documentation of what she perceived as Kudlak's inadequacies, summarized in her April 20, 2010 email to Thompson; and Plaintiff's reaction to the PIP, for example her comments to Kudlak that she believed herself more qualified for the supervisor position than Kudlak.

people work together they develop relationships beyond the realm of employment, and Asmo's pregnancy was particularly noteworthy given that she was pregnant with twins, a fairly unusual (and overwhelming) occurrence.

471 F.3d at 594 (internal citation omitted).

The circumstances of this case are distinct from *Asmo*. Even accepting the proposition that, per *Asmo*, there exists in the Sixth Circuit a "failure to congratulate" adverse inference test relative to employee pregnancy announcements, Thompson's behavior does not qualify as "suspect." Plaintiff did not inform Thompson directly of her pregnancy; Thompson heard about it second-hand from Kudlak. Thompson did not work closely with Plaintiff, nor see her often. There is no evidence that, after learning the news, Thompson had a meeting or even a chance encounter with Plaintiff before the incidents of May 14, 2010. Thus, Plaintiff was never in a situation where Thompson might have been subject to an *Asmo* expectation that she should offer some acknowledgment of or reaction to Plaintiff's news.[11]

Plaintiff's "failure to congratulate" argument amounts to a charge that Thompson harbored an illicit motive because she did not actively track down one employee with whom she had only a slight acquaintance, solely to offer well wishes on a pregnancy.

_____

[11]At oral argument, Plaintiff contended that, because she referenced her pregnancy in her May 14, 2010 email declining Thompson's request for a meeting, Thompson should have said something about the pregnancy when she later met with Plaintiff to inform her of her suspension. Again, context reveals the faults of this assertion. Given that Thompson's "meeting" with Plaintiff after receiving the email was to impose disciplinary action, the decision not to set the tone of that encounter with friendly chit-chat about Plaintiff's pregnancy hardly evinces a discriminatory motive. On the contrary, remarking on Plaintiff's pregnancy under such circumstances may lead to the inference that Plaintiff's pregnancy and suspension were somehow linked, a possibility Thompson may have recognized and sought to avoid.

This contention does not stand up.  Thompson's stated policy of not bringing up such matters can be seen as respectful of employees' privacy, appreciating that some people, like Plaintiff herself, prefer to keep their pregnancies separate from their working lives.  (*See* Megivern Dep. 156:2 ("I tried to keep my pregnancy separate from my job.").)  Indeed, employers might be forgiven in thinking that employees enjoy a significant degree of privacy in this area: just as the *Asmo* court interpreted a supervisor's silence as belying "speculation or assumption about how an employee's pregnancy will interfere with her job," 471 F.3d at 595, so too could an employer's special effort to initiate a discussion with an employee about her pregnancy be interpreted, in some cases, as evidence of discriminatory animus.  Thompson's "failure to congratulate" Plaintiff does not permit a reasonable inference that Plaintiff's termination was, in fact, motivated by discrimination.

      iv.  <u>Plaintiff's Termination Occurred Before the Expiration of the PIP</u>

Fourth, Plaintiff avers that, by not affording her the opportunity to complete her PIP, Defendant did not follow its internal procedures, thereby suggesting the performance issues cited for her termination are pretextual.  In some instances, an employer's failure to follow a policy related to termination can constitute relevant evidence of pretext.  *See, e.g.*, *Skalka v. Fernald Envtl. Restoration Mgmt. Corp.*, 178 F.3d 414, 421-22 (6th Cir. 1999).  Here, however, Plaintiff cites no internal policy that Defendant supposedly violated when Kudlak and Thompson began evaluating Plaintiff's performance under the PIP on May 14, 2010, five days before the PIP's termination date of May 19, 2010.  Plaintiff asserts, without citation to the record, that Thompson "wanted" to suspend Plaintiff based on the poor results of Kudlak's chart audit on April

34

15, 2010, but she was "overruled" by Human Resources and Plaintiff was instead placed on a PIP.  (Pl.'s Br. Opp'n Summ. J. 16.)  Plaintiff also presents testimony from Kudlak that a PIP is meant to "improve a person's performance" not "get rid of them." (Kudlak Dep. 89:17-21.)  Accordingly, as of May 11, 2010, Kudlak had not decided to recommend Plaintiff for termination because the PIP was still in place.  (*Id.* at 127:12-21.)  Nevertheless, according to Plaintiff, Thompson "decided the PIP need not be followed and terminated [Plaintiff] before she received a full opportunity to improve her supposedly deficient performance."  (Pl.'s Br. Opp'n Summ. J. 16.)  All that is well and good, but Plaintiff points to no Glacier Hills procedure that required Kudlak and Thompson to place Plaintiff on a PIP or that prevented them from terminating her until she completed one.

Furthermore, once Plaintiff was suspended for one week on May 14, 2010, she would not have returned to work before the PIP expired, so it was not unreasonable for Kudlak and Thompson to decide that it was time to evaluate her.  Most of the problems they found could not have been remedied if Plaintiff had been given the additional five days to work on the PIP.  Eleven of her thirteen completed assessments still would have been late.  Even if she had completed the five assessments that had been due as of May 14, 2010, they would have been late as well.  She had already failed to perform a resident's one-on-one visits as required by his care plan, improperly used volunteers to complete some of her paperwork, and behaved insubordinately to both Thompson and Kudlak.  In light of these circumstances, Thompson's decision to fire Plaintiff without allowing her to make up the time she was suspended under the PIP does not suggest pretext.

35

v. "Me Too" Evidence

Fifth and finally, Plaintiff provides anecdotal evidence allegedly showing that Glacier Hills employees Alicia Carey, Karen Klee, and Tabatha Smith suffered adverse employment actions under Thompson for pretextual reasons after announcing their pregnancy and/or taking medical leave.  (*See* Carey Aff. ¶¶ 20-21, Dkt. # 33-28; Klee Aff. ¶¶ 19-20, Dkt. # 33-7; Smith Aff. ¶¶ 11-17, Dkt. # 35-3.)  In contrast, Thompson recalls around thirty to forty employees who took pregnancy leave and returned to their jobs during her approximately two years at Glacier Hills, (Thompson Dep. 132:11-20), both Thompson and Kudlak are mothers who worked during and after their pregnancies, (*id.* 36:17-20; Kudlak Dep. 23:10-26:24), and Thompson routinely allowed, even encouraged, mothers to bring their babies into the workplace after returning from maternity leave, (Thompson Dep. 46:3-10, 133:25-134:11).

Generally, evidence tending to show that an employer engaged in a pattern or practice of discrimination "may be relevant to proving an otherwise-viable individual claim for disparate treatment under the *McDonnell Douglas* framework."  *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 575 (6th Cir. 2004); *see also McDonnell Douglas*, 411 U.S. at 804-05.  While this type of evidence is, most commonly, "statistics as to . . . employment policy and practice," *McDonnell Douglas*, 411 U.S. at 805, "anecdotal evidence may suffice to prove individual claims of discrimination," *Middleton v. City of Flint, Mich.*, 92 F.3d 396, 405 (6th Cir. 1996) (internal quotation marks omitted).  The Supreme Court has clarified that the relevancy of "me too" evidence—evidence of discriminatory treatment experienced by employees of Defendant other than a plaintiff claiming individual discrimination—"is fact based and

36

depends on many factors, including how closely related the evidence is to the plaintiff's circumstances and theory of the case." *Sprint/United Mgmt. Co. v. Mendelsohn*, 552 U.S. 379, 388 (2008). At trial, "courts regularly prohibit 'me too' evidence from or about other employees who claim discriminatory treatment because it is highly prejudicial, but only slightly relevant." *Reed v. Nat'l Linen Serv.*, 182 F.3d 918, 1999 WL 407463, at *7 (6th Cir. 1999) (unpublished table decision) (citing *Schrand v. Fed. Pac. Electric Co.*, 851 F.2d 152, 156 (6th Cir. 1988)). For example, in *Schrand*, the Sixth Circuit concluded the plaintiff's evidence of alleged statements to other employees that they were fired because they were "too old" was not relevant to the plaintiff's claim of age discrimination, when the other employees were terminated by a different decisionmaker and at a different time than the plaintiff, and there was no evidence that, like the plaintiff, the other employees were fired in the context of a consolidation of two of the defendant's branch offices. 851 F.2d at 156.

Initially, the court notes that Plaintiff has not provided, nor could the court discover, any Sixth Circuit case in which "me too" evidence carried a plaintiff's burden of establishing pretext in order to avoid summary judgment under the *McDonnell Douglas/Burdine* analysis. *See, e.g.*, *Johnson v. Interstate Brands Corp.*, No. 07-2227-An, 2008 WL 3823765, at *7 (W.D. Tenn. Aug. 12, 2008) ("[T]he [p]laintiff fails to cite any cases in the Sixth Circuit or elsewhere that stand for the proposition that a plaintiff can establish pretext in her age discrimination case by demonstrating that other persons who are not parties to the action can make a *prima facie* case of discrimination. The fact that . . . any other person *may* be able to establish a *prima facie* case of age discrimination in no way establishes that [the defendant]'s decision to terminate [the

37

plaintiff] was a pretext for age discrimination."). But even assuming that such evidence could demonstrate pretext, *see Moyes v. Keiser Sch., Inc.*, No. 4:09-CV-334-SPM/WCS, 2010 WL 3833959, at *7-8 (N.D. Fla. Sept. 28, 2010) ("[The plaintiff's] most compelling argument for pretext is found in the "me too" corroborative evidence of other impaired Keiser employees and the employment actions taken against them."), the affidavits provided by Plaintiff miss the mark, *see Jones v. St. Jude Med. S.C., Inc.*, ---F. Supp. 2d ----, 2011 WL 4543837, at *28-29 (N.D. Ohio 2011) (holding that "me too" evidence expressed in affidavits from two of the defendant's prior employees did not show pretext when affidavits reflected "subjective beliefs [of employees] that are irrelevant and highly prejudicial" and other employees' adverse employment actions did not involve "the same actions, reasons and circumstances" as the plaintiff's termination).

The affidavits from Carey, Klee, and Smith proffered by Plaintiff do not describe situations "closely related" enough to Plaintiff's "circumstances and theory of the case" to carry her past summary judgment. *See Mendelsohn*, 552 U.S. at 388. Carey and Klee worked in different departments than Plaintiff—Klee was a unit secretary and Carey a nurse assistant—and were not under Kudlak's supervision. While Smith was hired as an LEC after Plaintiff's termination, she too worked under a different supervisor as, by that time, Kudlak had transferred to the position of social worker.[12] All three

---

[12]Plaintiff relied heavily at oral argument on Smith's statement in her affidavit that "one coworker mentioned to me that what they were doing to me was just like what Glacier Hills had done to [Plaintiff]," contending that this was "damning" evidence of pretext. (Smith Aff. ¶ 13.) The court must disregard this statement, however, because it is hearsay. *U.S. Structures, Inc.*, 130 F.3d at 1189.

women came under Thompson's management, but only Carey and Smith allege that Thompson was directly involved in their discipline or termination.

Even if Carey's, Klee's, and Smith's positions at Glacier Hills are similar enough to Plaintiff's to allow comparison, and even assuming Thompson provides a continuity in decisionmaker, the circumstances surrounding those individuals' terminations do not support Plaintiff's theory of the case. Plaintiff alleges that she was terminated because of her pregnancy and, specifically, because of the medical leave that her pregnancy would require—hence her claims of FMLA and ERISA interference. However, of the three women, only Carey was pregnant at the time of her termination, and she had not yet given any notice of an intent to take maternity leave. Moreover, the reason given for Carey's termination was a single act of gross insubordination, which cannot be considered analogous to Plaintiff's placement on a PIP and later termination for a history of documented performance problems.

Klee's and Smith's situations are even more dissimilar. Klee was disciplined, placed on a PIP, and ultimately fired *after* she returned from work from a six-week medical leave following a miscarried pregnancy. Smith, who was never pregnant during her tenure at Glacier Hills, was also given a written warning and placed on a PIP *after* a one-week medical leave stemming from her diagnosis with shingles, and was *not* terminated prior to taking extended medical leave that ultimately exhausted her twelve-week allotment under the FMLA. Affidavits from two individuals disciplined after taking medical leave does not lend support to Plaintiff's theory that Defendant terminated her because of an anticipated need for medical leave. Plaintiff's anecdotal, "me too" evidence is only minimally, if at all, relevant to her claims and is insufficient to

39

demonstrate pretext.[13]  Thus, summary judgment is appropriate on Plaintiff's claim of pregnancy discrimination under the *McDonnell Douglas/Burdine* analysis.

## B.  Pregnancy Discrimination: Mixed-Motive Claim

Plaintiff also seeks to proceed past summary judgment on a mixed-motive claim of pregnancy discrimination.  Under Title VII, "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."  42 U.S.C. § 2000e-2(m).  When analyzing a mixed-motive claim, the *McDonnell Douglas/Burdine* framework does not apply.  *White*, 533 F.3d at 400.  Instead, "a Title VII plaintiff asserting a mixed-motive claim need only produce evidence sufficient to convince a jury that: (1) the defendant took an adverse employment action against the plaintiff; and (2) race, color, religion, sex, or national origin was *a* motivating factor for the defendant's adverse employment action."  *Id.* (internal quotation marks omitted).

Plaintiff's burden of producing evidence to support a mixed-motive claim "is not onerous and should preclude sending the case to the jury only where the record is devoid of evidence that could reasonably be construed to support the plaintiff's claim."

---

[13]In Plaintiff's renewed motion to compel, she also alludes to evidence regarding another employee, Glenna Barnes, who allegedly received two written warnings around the time she took a week of intermittent FMLA leave.  (Pl.'s Br. Supp. Renewed Mot. Compel 7, Dkt. # 35; *id.* Ex. G, Dkt. # 39.)  Again, there are not enough similarities to Plaintiff to support a finding of pretext.  There is no allegation that Barnes, who remains in Defendant's employ and appears to be a nurse, was pregnant during the relevant time period.  Additionally, there is no indication that Thompson was involved in the discipline, and it is unclear whether the decisionmakers even knew about Barnes' need for medical leave at the time the warnings were issued.

*Id.* The "ultimate question" in a mixed-motive analysis is simply "whether there are any genuine issues of material fact concerning the defendant's motivation for its adverse employment decision, and, if none are present, whether the law . . . supports a judgment in favor of the moving party on the basis of the undisputed facts." *Id.* at 402. Inquiries into what motivated an employer's decision "are very fact intensive" and "will generally be difficult to determine at the summary judgment stage." *Id.* (internal quotation marks omitted). Plaintiff's lighter burden in the mixed-motive context is counterbalanced by a limit on the available remedies. If Defendant can demonstrate that it would have still terminated Plaintiff in the absence of its impermissible discriminatory motive, Plaintiff is limited to declaratory or injunctive relief and cannot recover damages. *See* 42 U.S.C. § 2000e-5(g)(2)(B).

While the *McDonnell Douglas/Burdine* analysis does not apply to a mixed-motive claim, Plaintiff and Defendant rely on the same arguments they advance in the context of Plantiff's single-motive discrimination claim. As a result, the court concludes that the evidence examined above also supports summary judgment for Defendant on a mixed-motive theory, regardless of whether Plaintiff can show a genuine issue of material fact with respect to Defendant's motivation for Plaintiff's termination. Defendant alleged that Plaintiff's performance problems, particularly with respect to the failed PIP, justified Plaintiff's termination, regardless of her pregnancy. Plaintiff responded that this reason was insufficient to merit termination, arguing that other LECs, like Plaintiff, had been behind in their assessments. As discussed above, however, Plaintiff has failed to establish a fact issue on this point. *See supra* Section III.A.2.a. Thus, Defendant has demonstrated that it would have taken the same action even if Plaintiff had not been

41

pregnant, and Plaintiff is foreclosed from receiving damages for any mixed-motive

discrimination.  *See* 42 U.S.C. § 2000e-5(g)(2)(B).  As this is the only relief Plaintiff

seeks in her complaint, summary judgment on this claim is appropriate.

## C.  FMLA/ERISA Interference

Plaintiff alleges that, because Defendant terminated her shortly after she inquired

about FMLA and short-term disability leave, Defendant unlawfully interfered with her

exercise of rights and benefits due her under the FMLA and the ERISA.  *See* 29 U.S.C.

§ 2615(a)(1) ("It shall be unlawful for any employer to interfere with, restrain, or deny the

exercise of or the attempt to exercise, any right provided under [the FMLA]."); 29 U.S.C.

§ 1140 ("It shall be unlawful for any person to discharge, fine, suspend, expel,

discipline, or discriminate against a participant or beneficiary for exercising any right to

which he is entitled under the provisions of an employee benefit plan . . . .").  To

establish a prima facie claim of FMLA interference, Plaintiff must show that: (1) she was

an eligible employee; (2) the defendant was an employer as defined under the FMLA;

(3) the employee was entitled to leave under the FMLA; (4) the employee gave the

employer notice of her intention to take leave; and (5) the employer denied the

employee FMLA benefits to which she was entitled.  *Walton v. Ford Motor Co.*, 424 F.3d

481, 485 (6th Cir. 2005).  For ERISA interference, Plaintiff shows a prima facie claim

with evidence of: "(1) prohibited employer conduct (2) taken for the purpose of

interfering (3) with the attainment of any right to which the employee may become

entitled."  *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir. 1992).  As with

Plaintiff's single-motive discrimination claim, the court applies the *McDonnell*

*Douglas/Burdine* burden-shifting framework to Plaintiff's interference claims.  *Donald v.*

*Sybra, Inc.*, --- F.3d ----, 2012 WL 117613, at *4 (6th Cir. 2012); *Humpheys*, 966 F.2d at 1043.

Defendant does not contest Plaintiff's ability to establish a prima facie case of ERISA interference, therefore the court declines to analyze that aspect of Plaintiff's claim.  With respect to Plaintiff's FMLA claim, Defendant disputes only the notice element.  Plaintiff alleges that she provided the requisite notice during her May 13, 2010 meeting with Schauer, while Defendant contends that the meeting was purely "informational" and Plaintiff did not articulate an intent to take leave.  This is probably a fact issue.  Plaintiff need only provide information that "is sufficient to reasonably apprise it of the employee's request to take time off for a serious health condition," *Walton*, 424 F.3d at 486, and she "need not expressly assert rights under the FMLA," 29 C.F.R. § 825.302(c).  According to Plaintiff, she told Schauer during their meeting that she would "eventually" need to take leave "because [she] was pregnant with twins." (Megivern Dep. 110:15-17.)  If Plaintiff is to be believed, she can likely establish a prima facie claim of FMLA retaliation.  Nonetheless, as discussed above, Plaintiff cannot show that Defendant's legitimate reason for her termination is pretextual, so summary judgment is warranted on her interference claims as well as her discrimination claims.

### D.  Plaintiff's Renewed Motion to Compel

While Defendant's motion for summary judgment was pending, Plaintiff filed a renewed motion to compel production of "any performance evaluations, discipline, warnings, performance improvement plans, exit interviews, or termination notices for any person who requested leave or became pregnant during the time Kim Thompson was Director."  Now, and when Plaintiff first requested these materials on October 11,

43

2011, she argues that the discovery is justified insofar as it may uncover evidence that other Glacier Hills employees suffered adverse employment actions after announcing a pregnancy or requesting medical leave. Defendant responds that this request is overbroad and unduly burdensome: it does not have this information in any easily accessible form, and fulfillment of Plaintiff's request will require the expenditure of at least 157 man hours in cross-referencing employee disciplinary and medical files. Additionally, Defendant claims that any information Plaintiff is likely to receive will be of limited probative value.

When Plaintiff first brought this motion to compel, the parties and the court devised an intermediate plan to provide Plaintiff some of the information it sought without subjecting Defendant to an onerous discovery request. Specifically, the parties compiled a survey that Defendant presented to ten of its supervisors, asking them to identify any employee they recalled who asked about leave or disability benefits, disclosed a pregnancy or serious health condition, or requested maternity or medical leave. Twenty-one employees were identified through the survey, and any performance evaluations, termination notices, and disciplinary write-ups for those individuals were presented to Plaintiff. Of these, Plaintiff claims to have identified two employees who were treated unfairly after taking medical leave: Tabatha Smith and Glenna Barnes. As a result, she avers that complete fulfillment of her discovery request is now justified. The court disagrees.

At this point, "the burden or expense" of the discovery proposed by Plaintiff "outweighs its likely benefit." Fed. R. Civ. P. 26(b)(2)(C)(iii). As already noted, the relevancy of "me too" evidence of the type Plaintiff seeks to uncover through the

44

requested discovery is narrowly circumscribed.  *See, e.g.*, *Schrand*, 851 F.2d at 156.

Here, the allegedly similar instances of supposed discrimination and/or interference that

Plaintiff has already uncovered are not sufficiently relevant to Plaintiff's claims to merit

further discovery on this issue.  *See supra* Section III.A.2.b.v.  This is especially so

considering that the court has already sanctioned some discovery on this matter, and

Defendant persuasively argues that providing the requested materials will be overly

burdensome.  Consequently, the court will deny Plaintiff's renewed motion to compel.

## IV.  CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendant's motion for

summary judgment [Dkt. # 22] is GRANTED.

IT IS FURTHER ORDERED that Plaintiff's renewed motion to compel [Dkt. # 35]

is DENIED.


 s/Robert H. Cleland
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  February 17, 2012


I hereby certify that a copy of the foregoing document was mailed to counsel of record
on this date, February 17, 2012, by electronic and/or ordinary mail.

 s/Lisa Wagner
Case Manager and Deputy Clerk
(313) 234-5522